COMMONWEALTH vs. ENRIQUE SANTIAGO
(and three companion cases[1]).

No. 89-P-1153.

Middlesex. December 17, 1990. - March 8, 1991.

Present: ARMSTRONG, FINE, & LAURENCE, JJ.

*Constitutional Law*, Search and seizure, Confrontation of witnesses, Assistance of counsel. *Search and Seizure*, Threshold police inquiry, Probable cause, Automobile, Container, Standing to object. *Arrest*. *Probable Cause*. *Practice, Criminal*, Motion to suppress, Affidavit, Severance, Required finding, Argument by prosecutor. *Rules of Criminal Procedure*. *Controlled Substances*. *Joint Enterprise*. *Evidence*, Verbal completeness, Admissions and confessions, Cross-examination.

At the hearing on a motion to suppress evidence in a criminal case, the judge correctly ruled that the actions of police officers in approaching an automobile stopped for traffic violations were reasonable in the circumstances and were to be judged on the assumption that there was an investigative stop, not an arrest; that the actions of the defendants, both jumping abruptly from the vehicle and one defendant ducking, justified the limited search for weapons on one defendant's person; and that the vehicle's trunk was opened with the driver's consent, thus allowing the contraband, being in plain view, to be properly seized. [209-211]

A judge in a criminal case abused his discretion in denying, without a hearing on the merits, motions by two defendants to suppress a quantity of cocaine seized at the time of a contested search of the vehicle in which they were passengers, where the defendants, as passengers, had standing to contest the legality of the search and the seizure of the evidence; where, notwithstanding any insufficiencies in affidavits produced by the defendants, the purposes of the affidavit requirement of Mass R.Crim.P. 13 were satisfied; where, given the fact that a hearing on a third defendant's motion concerning the same incident was about to go forward, to allow their participation in the hearing would have required little extra time and inconvenience; and where their inability to participate may well have substantially affected their rights. [211-215]

A judge did not abuse his discretion in denying a criminal defendant's motion for severance of his trial from that of his two codefendants on the basis of the defendant's contention that a statement by a codefend-

---

[1]Two against Carlos J. Bernier and one against Evelyn Munoz.

ant, which was introduced in evidence, could be interpreted as implicating the defendant in the crime where, given the equivocal nature of the statement, it was unlikely to have affected the verdict. [215-216]

At the joint trial of three defendants charged with trafficking in cocaine, there was sufficient evidence of a criminal joint venture to warrant the denial of a motion by one of the defendants for a required finding of not guilty. [216-219]

At a criminal trial in which two defendants alleged that their opportunity to use a telephone at a police station was delayed more than an hour in violation of G. L. c. 276, § 33A, until a Spanish-speaking officer could eavesdrop on their conversations, exclusion of the officer's testimony concerning the conversations was not required, where the judge was warranted in finding any violation of the statute was unintentional. [219-220]

A criminal defendant's constitutional right to confront the witnesses against her was not abridged, nor was the fact-finding process rendered unfair, by a police officer's testimony concerning inculpatory statements he had heard the defendant make while under arrest at a police station; the officer's inability to recall, on cross-examination, the entire conversations of which the statements were a part did not require that his testimony be struck. [220-222]

At a criminal trial, the judge did not err in overruling an objection to the introduction of certain contraband "as being based upon a physically impossible fact," where the issue had been waived by the defendant's failure to raise the issue in connection with his pretrial motion to suppress, or to voice the contention at trial that he could not reasonably have known about it at the time of the hearing on the motion. [222-223]

Certain improprieties in a prosecutor's closing argument, viewed in the context of a lengthy trial, the entire closing argument, and the judge's instructions to the jury, were of little practical effect and did not deprive a criminal defendant of a fair trial on the central issue in the case. [223-225]


INDICTMENTS found and returned in the Superior Court Department on March 16, 1988.

A pretrial motion to suppress was heard by *James D. McDaniel, Jr.,* J.; additional pretrial motions to suppress were considered by him; and the cases were tried before him.

*Dana A. Curhan* for Carlos J. Bernier.

*Brownlow M. Speer,* Committee for Public Counsel Services, for Evelyn Munoz.

*Thomas F. Sullivan* for Enrique Santiago.

*David R. Marks,* Assistant District Attorney, for the Commonwealth.

FINE, J. Carlos Bernier, Evelyn Munoz, and Enrique Santiago were convicted of trafficking in cocaine, and Bernier was convicted also of possession of heroin, after a jury trial in Superior Court. The police found the cocaine and heroin after stopping a car in Malden which Santiago was driving and in which the other two defendants were passengers. The defendants' appeals are multifaceted. We discuss the facts in relation to each of the claims on appeal.

1. *Pretrial Issues.*

a. *Santiago's motion to suppress the cocaine.* Santiago's motion to suppress was heard by the same judge who presided over the trial. We summarize his findings, all of which are supported by evidence. On January 30, 1988, State Trooper Kevin O'Neill was directed to a Malden motel, with instructions to observe a particular room and await the arrival of another State trooper, David Sawyer. Trooper O'Neill knew only that the investigation had some connection with drugs.

The two officers arrived at the motel at about the same time. Trooper O'Neill observed Santiago leave the room carrying a bag, which turned out to contain garbage. When Santiago and Trooper O'Neill made eye contact, Santiago appeared startled and returned to his room. Someone in the room looked out the window. Then, within moments, Santiago, Bernier, and Munoz left the room. Santiago placed something in the trunk of a vehicle which all three entered, Santiago in the driver's seat and the other two in the front passenger seats. They drove off at a high rate of speed. The driving was erratic. Trooper O'Neill began to follow them in his marked cruiser. After a short while, he activated the light and siren. He saw the passengers looking in his direction, their heads bobbing up and down. Trooper O'Neill sought to stop the car for traffic violations. After some delay, Santiago abruptly pulled his car to the side of the road. Both front doors swung open, and Santiago and Bernier jumped out. Trooper O'Neill ordered both men to "freeze." Santiago raised his hands in the air; Bernier ducked down behind the car. Trooper O'Neill approached Bernier, and Trooper Saw-

yer, who had arrived at the scene just after Trooper O'Neill, took the keys from the ignition and approached Santiago. Trooper O'Neill, fearful for his safety, pat-frisked Bernier and felt a bulge in his "top left pocket" where he found a cigarette lighter, rolling papers, and heroin. He placed Bernier under arrest and advised him of his Miranda rights.

Santiago had no proof of ownership of the car, and various efforts to check his claim of ownership led the officers to believe that it might belong to someone else. The decision was made, therefore, to have the car towed to the police station. Trooper O'Neill asked Bernier if he had any personal belongings he wanted from the car. Bernier said he had a guitar in the trunk and wished to take it with him. When told by the trooper that Bernier wanted his guitar from the trunk, Santiago handed over his car keys. Trooper O'Neill opened the trunk and saw, in addition to the guitar, a gym bag and, protruding from the gym bag, a large rectangular-shaped package wrapped in masking tape. Based upon his training and experience, he believed the package contained drugs. Santiago and Munoz were then also placed under arrest.

The judge ruled, first, that the trooper had reason to stop the car for traffic violations. See *Commonwealth v. Figueroa,* 18 Mass. App. Ct. 967 (1984). At that time the trooper lacked probable cause for arrest for any drug offense, and the traffic violations did not justify an arrest. Thus, if the intrusion amounted to an arrest, it would have been invalid. There was no evidence presented at the motion hearing, however, that Trooper O'Neill had his gun drawn when he approached and ordered Santiago and Bernier to "freeze" or that Santiago's car was blocked. We agree with the judge that the officers' actions were reasonable in the circumstances and are to be judged on the assumption that there was a stop, not an arrest. See *Commonwealth v. Moses,* 408 Mass. 136, 141 (1990); *Commonwealth v. Fitzgibbons,* 23 Mass. App. Ct. 301 (1986). Contrast *Commonwealth v. Bottari,* 395 Mass. 777 (1985). We also agree with the judge's conclusion that the actions of Santiago and Bernier, both jumping abruptly from the car and Bernier ducking, justified

the limited search for weapons on Bernier's person. See *Commonwealth* v. *Sumerlin*, 393 Mass. 127, 131 (1984). Contrast *Commonwealth* v. *Figueroa*, 18 Mass. App. Ct. at 968. The trunk was opened, the judge concluded, with Santiago's consent, based, not upon any ruse, but upon Bernier's interest in retrieving his guitar and Santiago's handing over the car keys.

Relying on *Commonwealth* v. *Ford*, 394 Mass. 421, 426 (1985), Santiago contends that his State constitutional rights were violated when Trooper O'Neill opened the trunk to retrieve Bernier's guitar because there were no standard police procedures covering such actions. See also *Commonwealth* v. *Bishop*, 402 Mass. 449 (1988). In light of the finding of consent, we need not decide whether a police officer may honor a request of a passenger for personal belongings in a closed trunk of an automobile belonging to another, absent standard police procedures on the subject. Nor is it necessary for us to decide what significance to give to the fact that the package would inevitably have been discovered in the course of an inventory search conducted in accordance with a standard written State police motor vehicle inventory policy applicable to the contents of any towed car. See *United States* v. *Harris*, 390 U.S. 234 (1968); *Commonwealth* v. *O'Connor*, 406 Mass. 112 (1989). The contraband, being in plain view, was properly seized. Contrast *Commonwealth* v. *Silva*, 366 Mass. 402, 409-410 (1974).[2]

b. *Motions to suppress filed by Bernier and Munoz.* Santiago's motion to suppress, accompanied by his affidavit, was filed and heard on July 14, 1988. On May 13, 1988, a motion to suppress drugs seized in the same incident had been

---

[2]Bernier testified at the hearing on Santiago's motion to suppress, and an exhibit was introduced in evidence in the course of his testimony. Without explanation on the record, the judge ordered Bernier's testimony and the exhibit expunged from the record. The Commonwealth offers a possible explanation by suggesting in a footnote in its appellate brief that Bernier refused to answer some questions on cross-examination. In any event, Santiago did not proceed under Mass.R.A.P. 8(c), as amended, 378 Mass. 933 (1979), to perfect the record with respect to Bernier's testimony for purposes of appeal. We may not reverse the ruling, therefore, because of the alleged incompleteness of the record of the hearing.

filed on Munoz's behalf. Munoz's motion was accompanied by an affidavit signed by her attorney. On June 9, 1988, Bernier had filed a motion to suppress the same evidence, based upon the same police actions, also accompanied by an affidavit signed by his attorney. On July 14, 1988, all three defendants appeared for a hearing on the motions to suppress. On that date Munoz presented her own affidavit in which she swore to the truth of the contents of her attorney's affidavit, and Bernier also offered to produce his own affidavit. The judge denied the motions to suppress filed by Bernier and Munoz without a hearing on the merits. He appears to have based his action on their lack of standing to raise the issues as mere passengers in the car and on technical deficiencies, untimeliness, and the failure to produce affidavits with sufficient particulars based upon personal knowledge of the affiants. See Mass.R.Crim.P. 13(a)(2), 378 Mass. 871 (1979). He then proceeded to hear and decide Santiago's motion to suppress.

"When a defendant is charged with a crime in which possession of the seized evidence at the time of the contested search is an essential element of guilt, the defendant shall be deemed to have standing to contest the legality of the search and the seizure of that evidence." *Commonwealth* v. *Amendola*, 406 Mass. 592, 601 (1990). Both Munoz and Bernier, therefore, had standing. Their affidavits, however, did not meet the strict requirements of the rule. Ordinarily, a judge is not obligated to consider a motion not satisfying the requirements of an applicable rule. See *Commonwealth* v. *Bongarzone*, 390 Mass. 326, 337 (1983); *Commonwealth* v. *Pope*, 15 Mass. App. Ct. 505, 507 (1983). In some circumstances, however, insistence on strict requirements to deprive a defendant of a fair hearing of a motion raising a constitutional claim may be an abuse of discretion. See Mass.R.Crim.P. 2(a), 378 Mass. 844 (1979); *Commonwealth* v. *Santosuosso*, 23 Mass. App. Ct. 310 (1986). Cf. *Commonwealth* v. *Benjamin*, 358 Mass. 672, 676 n.5 (1971).

In this case, notwithstanding any insufficiencies in the affidavits, the purposes of the affidavit requirement of

Mass.R.Crim.P. 13 were satisfied. Those purposes, which we continue to regard as important, are "(1) to give the judge considering the motion a statement of anticipated evidence, in reliable form, to meet the defendant's initial burden of establishing the facts necessary to support his motion, and (2) to provide the Commonwealth with fair notice of the specific facts relied on in support of the motion set forth in a form, i.e., under oath, which is not readily subject to change by the affiant." *Commonwealth* v. *Santosuosso*, 23 Mass. App. Ct. at 313 (citation omitted). The affidavits filed by Bernier and Munoz were sufficient to indicate to the judge and prosecutor that both claimed constitutional violations in the warrantless search of the car Santiago was driving and in which they were passengers when it was stopped by Trooper O'Neill. Facts relating to the stop were contained in Santiago's affidavit, which the judge apparently regarded as sufficient, thereby providing the Commonwealth with the requisite notice. Any facts relating to the officers' knowledge of criminal activity or state of mind, on the other hand, were peculiarly available only to those officers. Aware that the claims were based upon a warrantless search, the Commonwealth must have known that it would have the burden of producing evidence bringing the search within one of the recognized exceptions to the warrant requirement. See *Commonwealth* v. *Antobenedetto*, 366 Mass. 51 (1974).

The hearing on Santiago's motion concerning the same incident was about to go forward. To allow Bernier and Munoz to participate in the hearing would have required little extra time and inconvenience. Their inability to participate may well have substantially affected their rights, notwithstanding the full hearing given to Santiago's motion. Evidence brought out later in the course of the trial, but which Santiago failed to raise in the course of his hearing, might have been brought out by Bernier and Munoz at the motion hearing by way of cross-examination of Trooper O'Neill or introduction of additional evidence. Among other things, in an effort to show that the degree of intrusiveness was so unreasonable that the officers effected an arrest rather than a stop, they might have

brought out evidence, produced for the first time at trial, that Trooper O'Neill approached the car with his gun drawn. To discredit testimony that the heroin was taken from Bernier's top shirt pocket, they might have brought out the evidence produced at trial that Bernier might have been wearing a sweater that had no pocket. Further, they might have presented evidence of the circumstances of the opening of the opaque rectangular container in which the cocaine was packed and raised the issue, not raised by Santiago at the hearing on his motion to suppress, that a warrant was required. According to the evidence at trial, the package was opened at the State police testing laboratory the day following the arrest. Unless the package was opened in conformity with a written State police inventory policy, or the container's distinctive appearance clearly announced its contents, in the absence of either a search warrant or probable cause to search the entire car, the warrantless opening of the package would raise questions of constitutional dimension. See *United States* v. *Chadwick*, 433 U.S. 1 (1977); *Arkansas* v. *Sanders*, 442 U.S. 753 (1979); *Robbins* v. *California*, 453 U.S. 420 (1981); *Commonwealth* v. *Bishop*, 402 Mass. at 451. See also *Texas* v. *Brown*, 460 U.S. 730, 747-751 (1983) (Stevens, J., concurring). Of course, if it should be found that Trooper O'Neill discovered the heroin on Bernier's person, there may have been probable cause to believe that the vehicle contained drugs, justifying a search of every part of the vehicle and its contents. See *Commonwealth* v. *Ross*, 456 U.S. 798, 823-825 (1982); *Commonwealth* v. *Cast*, 407 Mass. 891, 901-903 (1990); *Commonwealth* v. *Moses*, 408 Mass. at 144; *Commonwealth* v. *Jiminez*, 22 Mass. App. Ct. 286, 290-291 (1986). If there was probable cause, it would be immaterial whether the package was opened during the initial stop or after it was taken into police custody. *United States* v. *Johns*, 469 U.S. 478, 486-487 (1985). *United States* v. *Burnett*, 791 F.2d 64, 68 (6th Cir. 1986).

We rule that it was an abuse of discretion to deny Bernier and Munoz the right to be heard on their motions to sup-

press, and we order that those motions now be heard. Munoz contends that facts relating to the search, which came out at trial but not at the hearing on Santiago's motion to suppress, require this court to rule that the cocaine should have been suppressed. Not only are there possible legal obstacles to such a ruling, but credibility issues would be involved in the determinations she asks us to make, and we would not make them in the first instance.

c. *Bernier's severance motion.* Bernier moved unsuccessfully before trial for severance of his case from that of Santiago and Munoz. The motion was based on a statement made by Santiago to Munoz at the police station after the arrest that "We are all fucked."[3] The statement was introduced in evidence. The judge instructed the jury immediately, however, and again at the close of the evidence, that it should not be considered as evidence against Bernier. Relying on *Bruton v. United States*, 391 U.S. 123, 135 (1968), Bernier alleges that, because the jury heard what amounted to a statement that implicated him in the crime and because Santiago exercised his privilege under the Fifth Amendment to the United States Constitution not to testify, Bernier was deprived of his right of confrontation under the Sixth Amendment to the United States Constitution.

We do not think the *Bruton* rule applies to the statement. We regard it as neither powerfully incriminating nor devastating. See *Commonwealth v. Devlin*, 365 Mass. 149, 159-161 (1974); *Commonwealth v. French*, 357 Mass. 356, 375 (1970). The statement is ambiguous, and Bernier was not named. See *Commonwealth v. Keevan*, 400 Mass. 557, 570 (1987). Read in context, we do not think it likely the words used would be interpreted as to implicate Bernier in the traf-

---

[3]Bernier was not present during the conversation, which was as follows: Santiago said to Munoz, "The only one that can get you out is Tatto." Munoz responded, "I'm fucked. Paulina talked with Tino." Santiago: "Why did they single my car?" Munoz: "I didn't tell them anything." Santiago: "We are all fucked. Your parents have the money." Munoz: "Call Tatto." Santiago: "Call Pauline, tell her to call Tatto."

ficking offense. Even if Bernier was intended to be included in the pronoun "we," or the word "all," the more likely reference is to the predicament of the three defendants at the time, having been caught with cocaine in the trunk and heroin in Bernier's pocket, being under arrest, and experiencing difficulty arranging bail. Because the *Bruton* rule does not apply, we need not decide whether the admission of the statement was harmless beyond a reasonable doubt under the stringent test of *Commonwealth* v. *Sinnott*, 399 Mass. 863, 872 (1987), and *Commonwealth* v. *Cunningham*, 405 Mass. 646, 649 (1989). See also *Commonwealth* v. *Bongarzone*, 390 Mass. at 342; *Commonwealth* v. *Keevan*, 400 Mass. at 570. Given the equivocal nature of the statement, however, we think it most unlikely that it affected the verdict. The judge did not abuse his discretion in denying Bernier's motion to sever.

2. *Trial Issues.*

a. *Sufficiency of the evidence of trafficking against Bernier.* Of the three defendants, only Bernier challenges on appeal the sufficiency of the evidence against him of trafficking in cocaine. His motion for a required finding of not guilty filed at the close of the Commonwealth's case was denied, and he offered no evidence in his defense. The quantity of cocaine, over 1,000 grams, was sufficient to satisfy the requirements for conviction of trafficking (G. L. c. 94C, § 32E[*b*][3]), and there was evidence tying both Munoz and Santiago directly to the cocaine. The case against Bernier, on the other hand, was presented to the jury on a joint venture theory. We must decide, therefore, whether any rational trier of fact, taking the evidence and reasonable inferences therefrom in a light most favorable to the Commonwealth, could have found beyond a reasonable doubt that Bernier participated in the offense, at least as a joint venturer. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). The test is "whether [the] defendant was (1) present at the scene of the crime, (2) with knowledge that another intend[ed] to commit the crime or with intent to commit a crime, and (3) by agreement [was] willing and available to help the other if

necessary." *Commonwealth* v. *Longo,* 402 Mass. 482, 486 (1988), and cases cited. See *Commonwealth* v. *Mahoney,* 405 Mass. 326, 327 (1989); *Commonwealth* v. *Ramos, ante* 915 (1991).

Bernier's presence and his association with Santiago and Munoz are established. His appeal turns on the sufficiency of the evidence that he knew of their criminal activities and intended to render them aid and assistance. It is rare that one's state of mind can be proved by direct evidence. Resort must be had, therefore, to the facts and circumstances and the reasonable inferences to which they give rise. See *Commonwealth* v. *Longo,* 402 Mass. at 486-487. Inferences of knowledge and intent need not be necessary or inescapable; it suffices for these purposes if the inferences are reasonable and possible. See *Commonwealth* v. *Casale,* 381 Mass. 167, 173 (1980).

The evidence linking Bernier to the trafficking offense was the following. He checked into the Malden motel with Munoz and Santiago at 3:00 A.M. on January 25, 1988, and took an adjoining room. All three listed the same home address, in Chelsea, and the same car registration. On January 28, 1988, the three moved from the rooms in which they had been staying into one room. A large number of telephone calls were made from the room, including some out-of-State and overseas. Eleven calls were made on January 28, twenty-three on January 29, and twelve on January 30. Santiago had a beeper in his possession, and Munoz had a "curb sheet," or drug price list. The three left the room hurriedly together on January 30, 1988, once the presence at the motel of a State police cruiser was noted. Santiago threw something into the trunk of the car, and it sped off. The car did not stop when the cruiser's light and siren were first activated. Bernier was seen peering at the cruiser several times and then bobbing down. When the car came to a sudden stop, Santiago and Bernier jumped out, and Bernier ducked behind the car. The brick found in the trunk of the car was seventy-eight percent pure cocaine. It was packed in plastic and masking tape and was surrounded by coffee grounds.

The cocaine probably cost $18,000 to $23,000, and, diluted, it had a potential street value of $400,000. A State police officer with experience in the narcotics trade testified that traffickers often use neutral locations, such as motels, and beepers, and often have other persons along with them to provide security and to act as look-outs. He also testified that it was common for traffickers to surround the cocaine with coffee grounds to evade detection in transit by police dogs.

We think a reasonable jury, using common sense, could conclude that the stay of several days at the motel, a neutral location, the numerous phone calls, the beeper, and the flight from the police were all related to the valuable brick of cocaine, that the cocaine was probably in the motel room and carried out and dropped in the trunk by Santiago, and that all three defendants formed a link in the chain leading to its eventual sale on the street. Contrast *Commonwealth* v. *Mandile*, 403 Mass. 93, 101 (1988); *Commonwealth* v. *Saez*, 21 Mass. App. Ct. 408, 411-412 (1986).

The jury could have found that Bernier participated in the offense by providing surveillance as the car driven by Santiago was fleeing from the police. Even absent proof of actual participation, however, his presence during the stay at the motel and during the flight from the police put him in a position to aid the venture, if necessary, and could, thus, have encouraged or emboldened his cohorts. See *Commonwealth* v. *Casale*, 381 Mass. at 173; *Commonwealth* v. *Amaral*, 13 Mass. App. Ct. 238, 242 (1982). The stay at the motel for several days while Bernier had a home address nearby was not a commonplace occurrence. While Bernier's flight from the police, suggesting consciousness of guilt, would not, by itself, be sufficient to prove the requisite knowledge and intent, see *Commonwealth* v. *Salemme*, 395 Mass. 594, 601-602 (1985), we think all the circumstances together, including the flight, give rise to a reasonable inference that the activities of all three individuals, including Bernier, over the course of the few days before apprehension were directed towards possessing and eventually transferring the valuable

brick of cocaine. Bernier's motion for required finding of not guilty of trafficking, therefore, was properly denied.

b. *Admissibility of statements made by Santiago and Munoz on the telephone.* General Laws c. 276, § 33A, requires the police to inform anyone "held in custody" of his right to use the telephone "forthwith upon . . . arrival at [the] place of detention" and to permit use of the telephone "within one hour thereafter."[4] Santiago and Munoz contend that the police intentionally violated that statute by failing to give them timely notification of their right to use the telephone and by waiting more than an hour before affording them the opportunity to use a telephone. Any evidence obtained as a result of that delay, they maintain, should have been suppressed. See *Commonwealth* v. *Jones*, 362 Mass. 497, 503 (1972).

Neither Santiago nor Munoz claimed in the trial court that there was any delay in notifying them of their right to use the telephone. There was some evidence that Santiago was given his rights in a timely manner and that, even if there was some delay in formally giving Munoz her rights, she assisted the police by translating when her codefendants were being given their rights. The record does not indicate conclusively, therefore, that the required notification was not given. In these circumstances, we need not consider the argument on appeal. See *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 609 (1987).

With respect to the allegation that their opportunity *to use* a telephone was intentionally delayed more than an hour,

---

[4]General Laws c. 276, § 33A, as amended through St. 1963, c. 212, states:

> "The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter."

Santiago and Munoz claim that the police waited to permit them to use a telephone until a Spanish-speaking officer could eavesdrop on their conversations. Trooper Dagoberto Driggs had been summoned from another location and arrived at the station about four hours after the defendants had arrived. He was in the booking room with Santiago and Munoz when they asked to use the telephone. Without informing them that he understood Spanish, Trooper Driggs listened to Santiago and Munoz as each conversed on the telephone in Spanish. He made notes while they were on the telephone and testified about the conversations at trial.

Before allowing the testimony, the judge held a voir dire and found that any delay in giving the defendants the opportunity to use the telephone was not intentional. There was evidentiary support for the finding. Trooper Driggs testified that while he was in the booking room with Santiago and Munoz he overheard them speaking to each other in Spanish, and they discussed whether the calls should be made. They asked to use the phone following that conversation, and the phone was made available. No evidence was presented that either Santiago or Munoz had requested and been denied earlier use of the phone. Indeed, Trooper O'Neill testified that Munoz had made one or two phone calls before Trooper Driggs's arrival. As the judge's finding that any violation of the statute was unintentional was warranted, exclusion of the conversations was not required. See *Commonwealth* v. *Parker*, 402 Mass. 333, 341 (1988).

Munoz makes the further argument that Trooper Driggs should not have been permitted to testify concerning her inculpatory statements made on the telephone in the booking room because he was unable to recall the entire conversations. On cross-examination, Munoz established that she had conversed in Spanish, that Trooper Driggs had made notes only in English and only of statements that might be incriminating, that he was relying on those notes for his testimony, and that he did not remember any other parts of the conversation or whether there were any exculpatory statements.

Based on the cross-examination, she moved to strike Driggs's testimony.

Munoz relies, first, on the doctrine of "verbal completeness." In accordance with that doctrine she would be entitled to offer other parts of a conversation introduced against her so long as they dealt with the same subject matter and explained or qualified the part of the conversation which was admitted. See *Commonwealth* v. *Watson*, 377 Mass. 814, 825-834 (1979), and cases cited; *Commonwealth* v. *Crowe*, 21 Mass. App. Ct. 456, 478-479 (1986); Liacos, Massachusetts Evidence 443 (5th ed. 1981). The doctrine governs the admissibility of statements otherwise inadmissible, not the exclusion of statements otherwise admissible. Thus, it has no application to the present situation.

Munoz raises a more serious question about Trooper Driggs's testimony based upon her constitutional right of confrontation. "The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis* v. *Alaska*, 415 U.S. 308, 315-316 (1974), quoting from 5 Wigmore, Evidence § 1395, at 123 (3d ed. 1940). See *Commonwealth* v. *Funches*, 379 Mass. 283, 292 (1979). Where there is no opportunity to cross-examine a witness, because, for example, he is uncooperative, fails to appear, or invokes his privilege against self-incrimination, the striking of any direct testimony by that witness may be constitutionally required. *Ibid.* See also *Commonwealth* v. *Johnson*, 365 Mass. 534, 543 (1974); *Commonwealth* v. *Furtick*, 386 Mass. 477, 482-483 (1982); *Commonwealth* v. *Kirouac*, 405 Mass. 557, 560-562, 564 n.6 (1989). Generally, a witness's inability to answer questions on cross-examination due to lapse of memory, however, does not require striking his direct testimony. *Commonwealth* v. *Amirault*, 404 Mass. 221, 234-235 (1989). See *United States* v. *Owens*, 484 U.S. 554, 562 (1988).

Trooper Driggs may well have testified honestly about his lapse of memory. The situation is unusual, however, insofar as Trooper Driggs may have put himself beyond the reach of effective cross-examination by his selective note taking. Un-

questionably, such a police practice has a potential for un-
fairness and should be avoided.[5] Compare *Commonwealth v.
Fernette*, 398 Mass. 658, 664-665 (1986). The trial judge
might have been warranted in excluding the evidence on
those grounds. We decline to rule, however, that exclusion
was required. Considering, by analogy, the constitutional re-
quirement set forth in *Brady* v. *Maryland*, 373 U.S. 83
(1963), that the prosecution disclose all exculpatory evidence
in its possession, a defendant is not entitled to a remedy un-
less he can show that the undisclosed evidence would have
been exculpatory. See *Commonwealth v. Pisa*, 372 Mass.
590, 595-596 (1977); *Commonwealth v. Doherty*, 394 Mass.
341, 348 (1985). There is no indication from any source that
Munoz actually made any exculpatory statement during the
conversation. The claim of unfairness, therefore, is based
upon speculation. Moreover, Munoz's attorney cross-ex-
amined Trooper Driggs thoroughly about the limitations of
his memory, his reliance on the notes, made in English of a
Spanish conversation, to refresh his memory, and, in particu-
lar, the fact that he had made notes only of the incriminating
parts of the conversation. In the circumstances, it is not clear
that the "fact-finding process" was "so distort[ed] . . . that
the Constitution compels a remedy." *Commonwealth v.
Funches*, 379 Mass. at 292.

c. *Santiago's claim of physical impossibility.* Trooper
O'Neill testified that he discovered the heroin in Bernier's
shirt pocket when Bernier was being pat-frisked for weapons.
Santiago claims on appeal that evidence he introduced, in-
cluding a sweater and a photograph taken of Bernier during
the booking process, show that Bernier was wearing a
sweater without pockets at the time of his arrest. He con-
tends, therefore, that any evidence found as a result of the
pat-frisk of Bernier should have been excluded "as being
based upon a physically impossible fact." Although Santiago
made no such contention at the hearing on his motion to sup-

---

[5] In such situations, an officer should at least jot down the general thrust
of the conversation and note any exculpatory statements, or the fact that
none were made.

press, he did make the contention at trial by objecting to the introduction in evidence of the drugs.

It was not error to overrule the objection. Santiago neither raised the issue in connection with his motion to suppress nor voiced the contention at trial that he could not reasonably have known about it at the time of the hearing on the motion. Thus, the issue was waived. See Mass.R.Crim.P. 13(a)(2), 378 Mass. 871 (1979); *Commonwealth* v. *Bailey*, 370 Mass. 388, 398 (1976); *Commonwealth* v. *Gauthier*, 5 Mass. App. Ct. 185, 187 (1977); *Commonwealth* v. *Mott*, 5 Mass. App. Ct. 811 (1977). Moreover, it would not have been impossible for Bernier to change his clothing between the time of his arrest and being photographed.[6] Even assuming Bernier was wearing a sweater without pockets at the time of arrest, suppression would not be required. Trooper O'Neill's memory may have been faulty; he might have found the drugs in Bernier's pants pocket. Any inconsistency between Trooper O'Neill's testimony and other evidence was a proper basis upon which to impeach the witnesses' version of the search. Santiago took full advantage of his right to present the inconsistency to the jury for whatever that might have been worth to him.

d. *The prosecutor's closing argument.* Bernier argues that the prosecutor made improper closing argument. At trial, he failed to object to the prosecutor's argument, however, indicating, to some extent at least, that he did not then view the argument as unfairly prejudicial. We review the argument to determine whether there were errors which created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Sanchez*, 405 Mass. 369, 375 (1989), and cases cited.

Some portions of the argument Bernier now challenges were not improper. The prosecutor stated that in departing from the motel Bernier was "attempting to run for it." That was a reasonable inference from the evidence. When viewed in context, the statement "we know [Santiago, Bernier and

---

[6]Trooper O'Neill testified that he was not certain when Bernier was photographed and that it was not uncommon for persons under arrest to change clothes while in custody.

. Munoz] were working together" was not a suggestion of the prosecutor's personal knowledge but a request that the jury draw that inference from the evidence.

In three instances the prosecutor's argument may have been unsupported by the evidence. The prosecutor stated that when Bernier jumped from the car "he thought about [fleeing] for some time." Although not a matter of great significance, the prosecutor may have crossed the line into speculation. The prosecutor also said that no telephone calls were made by the defendants during their first three days at the motel. In fact, there was evidence that one call was made on one of those days, and there were no records for other days. The Commonwealth concedes some exaggeration on the prosecutor's part. The significant point about the telephone calls, in our view, however, was the large number made on the last two days and not the paucity of calls on the other days. Finally, the prosecutor, in commenting on the evidence that Bernier had only four dollars on his person when arrested, stated "all his money was tied up in the cocaine and the heroin." There was no such direct evidence, however.

Proper argument should be limited to the evidence and fair inferences based on the evidence. See *Commonwealth* v. *Connor*, 392 Mass. 838, 853 (1984). The judge instructed the jury that arguments of counsel were not evidence, and the verdict was to be based only on the evidence. The errors, viewed in the context of the lengthy trial and the entire closing argument, dealt with collateral issues and were far from outrageous. See *Commonwealth* v. *Kozec*, 399 Mass. 514, 522 (1987). Although the evidence against Bernier was not overwhelming, we think the improprieties, in light of the judge's instructions, were of little practical effect and did not deprive Bernier of a fair trial on the central issue. Contrast *Commonwealth* v. *Hoppin*, 387 Mass. 25, 31 (1982).

Accordingly, we affirm Santiago's conviction. We remand the cases against Bernier and Munoz for a hearing on their motions to suppress. If the motions are allowed, subject to the Commonwealth's right of appeal, see Mass.R.Crim.P. 15(a)(2), 378 Mass. 882-883 (1979), the convictions of the

defendants Bernier and Munoz shall be reversed and they shall be entitled to a new trial. If the motions are denied, the convictions shall be affirmed, subject to the defendants' right to appeal from the denial of the motion to suppress.

*So ordered.*